IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SUPERIOR PERFORMERS, INC. d/b/a | ) | |
| NATIONAL AGENTS ALLIANCE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:13CV1149 |
| SHAWN L. MEAIKE, MARC J. MEADE, | ) | |
| BRYANT STONE, FRANK EUFEMIA, | ) | |
| JAIME EUFEMIA, and MICHAEL SIZER, | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## MEMORANDUM OPINION AND ORDER

BEATY, District Judge.

This matter is before the Court on a Motion for Preliminary Injunction [Doc. #13] filed by Plaintiff Superior Performers, Inc., d/b/a National Agents Alliance ("Plaintiff" or "NAA"). Defendants are Shawn L. Meaike, Marc J. Meade, Bryant Stone, Frank Eufemia, Jaime Eufemia, and Michael Sizer ("Defendants"). The Court previously granted Plaintiff's Motion for Temporary Restraining Order ("TRO") [Doc. #36], which expires upon issuance of this Order, pursuant to the Court's statement to that effect at the March 5, 2014 hearing on Plaintiff's Motion for Preliminary Injunction. Thereafter, the ruling of the Court in the present Order will govern the parties, unless there are future Orders by the Court.

In response to Plaintiff's Motion for Preliminary Injunction, Defendants filed a Response in Opposition to Plaintiff's Motion for Preliminary Injunction [Doc. #48] with declarations by each Defendant, a "Supplemental Brief" in Opposition to the Motion for Preliminary Injunction and Motion to Compel Letters Related to the TRO or the March 5, 2014 Hearing [Doc. #68], a Reply to Plaintiff's Response to the Supplemental Brief [Doc. #75], and

two Motions to Strike [Docs. #44, #65] the affidavits and declarations that Plaintiff filed in support of its Motion for Preliminary Injunction. Additionally, Plaintiff filed a Reply to Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction [Doc. #57], supplemental evidence in addition to that which was filed with the Motion for Preliminary Injunction, a Response to Defendants' Supplemental Brief [Doc. #70], and a Response in Opposition to Defendants' first Motion to Strike [Doc. #56]. These Motions are ripe for review,[1] upon conclusion of the Court's March 5, 2014 hearing on the Motion for Preliminary Injunction [Doc. #13]. For the reasons set forth below, the Court will grant in part and deny in part Plaintiff's Motion for Preliminary Injunction [Doc. #13], deny Defendants' Motions to Strike [Docs. #44, #65], and deny as moot Defendants' Motion to Compel [Doc. #68].

I.    FACTUAL BACKGROUND

For purposes of disposing of Plaintiff's Motion for Preliminary Injunction, the evidence presented thus far tends to show the following facts. Plaintiff, doing business as National Agents Alliance ("NAA"), is an Independent Marketing Organization and Managing General Agent for various life insurance companies. Plaintiff earns a portion of the commissions made by NAA agents selling life insurance issued by those insurance companies. NAA agents also recruit other agents to work for NAA, and the recruiting agents then earn an extra commission

---

[1] The Court notes that neither Defendants' Motion to Dismiss for Failure to State a Claim [Doc. #31], nor Plaintiff's Motion to Amend the Amended Complaint [Doc. #62], is ripe for review, and therefore, neither Motion will be addressed in this Order. Furthermore, Plaintiff also filed a Motion to Quash Defendants' Subpoena of Andy S. Albright [Doc. #63] to appear at the preliminary injunction hearing, which the Court granted at the hearing.

on sales made by any new agents they recruit. The newly recruited agents are called "Downline Agents," and when they join, both the Downline Agent and the recruiting agent sign an Agent Agreement with Plaintiff. In the course of working for Plaintiff, agents are required to, among other things, buy "leads" (names and contact information for people who are supposedly interested in buying insurance) from Plaintiff, and then cold call those leads in hopes of eventually selling life insurance to those individuals.

When Defendants individually began working as NAA agents, they each signed an Agent Agreement with Plaintiff. Then in order to access the website where the leads are retrieved, they had to periodically electronically sign, or "click through," an Agent Agreement to reaffirm their consent to its terms and conditions. In multiple Agent Agreements clicked through by each Defendant, including the most recent Agreements, there is a restrictive covenant that purports to restrict these agents' freedom to interact with any current NAA employee or independent contractor. (E.g., Ex. A - Pl.'s Mot. for Prelim. Inj. [Doc. #15-1], ¶ 15 at 10.) This restrictive covenant reads as follows:

> Non-Solicitation of Employees and Independent Contractors. During the Restriction Period, the Independent Contractor shall not, directly or indirectly: (a) solicit for the provision of services or employment any employee or independent contractor of NAA or its Affiliates, (b) advise or recommend to any other person that they employ or solicit for provision of services any employee or independent contractor of NAA or its Affiliates, or (c) encourage or advise such employees or independent contractors to sever, discontinue or not renew any agreement or relationship to NAA or its Affiliates, or (d) otherwise establish or seek to establish any business relationship with any such employee or independent contractor relating to the sale of Life Insurance Products.

(Id.) The Agent Agreement defines the restriction period as "the period of time Independent Contractor provides services to NAA or services as a down-line agent of NAA and for a period

of two (2) years following the termination of Independent Contractor's provision of such services." (Id. ¶ 10g at 9.)

Additionally, Defendant Meaike, Defendant Meade, and Defendant Stone also entered into Management Agreements, which included a restrictive covenant with nearly identical restrictions. (E.g., Ex. B - Pl.'s Mot. for Prelim. Inj. [Doc. #15-2], ¶ 8 at 5.) The restrictive covenant in these Agreements reads as follows:

> Non-Solicitation of Employees and Independent Contractors. During the period of time Independent Contractor provides services to or for the Company and for a period of two (2) years following the termination of Independent Contractor's provision of services to the Company, the Independent Contractor shall not, directly or indirectly, solicit for provision of services, advise or recommend to any other person that they employ or solicit for provision of services, or otherwise establish or seek to establish any business relationship relating to the sale of insurance products with, any employee of the Company or of its affiliates or any other independent contractor or of its affiliates, or encourage or advise such employees or independent contractors to sever, discount or not renew any agreement or relationship to the Company.

(Id.)

Each Defendant's independent contractor relationship with Plaintiff was terminated in either December 2013 or January 2014.[2] Each Defendant has now joined Defendant Meaike's new venture, Family First Life ("FFL"). As of the March 5, 2014 hearing, it appears that approximately 186 of Plaintiff's current and former agents have signed on to work with FFL. (Sheckells Aff. [Doc. #59], ¶ 6 at 2.) Of those 186, approximately 121 of them are current NAA agents now working for FFL. (Id.) Plaintiff alleges that, at a minimum, Defendants are in

---

[2] Such termination appears to be either by resignation, as in Mr. Meaike's case, or by Plaintiff "effectively fir[ing]" them (which is how the other Defendants characterize the termination of their agent relationship with Plaintiff). (Resp. to Pl.'s Mot. for Prelim. Inj. [Doc. #48, at 9.])

violation of the restrictive covenant because they have "otherwise establish[ed]" a business relationship with these 121 current NAA employees or independent contractors.[3] Plaintiffs also allege that some or all of these 121 agents were solicited directly or indirectly by Defendants, which Defendants dispute.[4]

The Court previously granted Plaintiff's Motion for TRO [Doc. #36], which remained in effect from the March 5, 2014 hearing until this Order was issued. At the March 5, 2014 hearing on Plaintiff's Motion for Preliminary Injunction [Doc. #13], the Court heard arguments as to the Motion and the Court has reviewed evidence submitted by both parties. Plaintiff's Motion for Preliminary Injunction rests on its breach of contract claim. Specifically, Plaintiff seeks to continue enjoining Defendants "and those in active concert with them" from the

---

[3] At the March 5, 2014 hearing, Plaintiff's counsel clarified its position that the "otherwise establishing a business relationship" portion of the clause applies only to current NAA employees or independent contractors. Therefore, according to Plaintiff, an NAA agent is free to leave NAA, and then begin work with Defendant Meaike's new company, as long as they were not solicited, or encouraged or advised to leave NAA, by Defendants or anyone subject to the same restrictive covenant.

[4] As to this allegation, Plaintiff's counsel points to a "smoking gun" document on this point with regard to Defendant Meaike. Plaintiff has repeatedly pointed to this document, a guaranty agreement purportedly signed by Defendant Meaike as guarantor for Defendant Stone, which states in part that "the above named life insurance agent" (Defendant Stone) was "recruited by me" (Defendant Meaike). (Ex. G – Second Aff. of Tanisha Palvia [Doc. #58-8], at 8.) However, that is not the entirety of the language in the guaranty agreement. A more comprehensive reading is provided here: "In order to Induce Americo Financial Life and Annuity Insurance Company (Americo) to enter into an agent relationship with *the above named life insurance agent recruited* by me, or *for my agency*, and on whose production I will receive an override commission[ ], I, as guarantor, hereby personally and unconditionally guarantee . . . ." (Id. (emphasis added).) Because Defendant Meaike is an owner of FFL, an alternative interpretation of this guaranty agreement is that Defendant Stone was recruited *for FFL* (not a party to this lawsuit)—that is, recruited by someone else who works for the "agency," that is, FFL, rather than directly or indirectly recruited by Defendant Meaike.

following conduct:

> (1)    Soliciting for the provision of services or employment any employee or independent contractor of NAA;
>
> (2)    Encouraging or advising such employees or independent contractors to sever, discontinue or not renew any agreement or relationship to NAA; and
>
> (3)    Otherwise seeking to establish any business relationship with any such employee or independent contractor relating to the sale of life insurance products.

(Pl.'s Mot. for Prelim. Inj. [Doc. #13], at 1-2.)  Plaintiff later contended in its Reply and at the hearing that its unfair and deceptive trade practices claim forms a separate basis for injunctive relief.  (Pl.'s Reply to Def.'s Resp. to Mot. for Prelim. Inj. [Doc. #57], at 9.)  However, the only basis upon which Plaintiff sought preliminary injunctive relief in its Motion for Preliminary Injunction was on the breach of contract claim.[5]  Therefore, the Court will not consider the alternative basis for injunctive relief raised for the first time in Plaintiff's Reply Brief.  See Fed. R. Civ. P. 7(b)(1)(B) ("A request for a court order must be made by motion.  The motion must: . . . state with particularity the grounds for seeking the order . . . .").

II.    MOTIONS TO STRIKE

Prior to considering the merits of Plaintiff's Motion for Preliminary Injunction, the Court notes that Defendants filed two Motions to Strike Plaintiff's evidence in whole or in part, arguing that the affidavits submitted in support of the Motion for Preliminary Injunction were either untimely presented or they contain inadmissible hearsay, speculation, and/or a lack of

---

[5] See supra Part III for discussion on the adequacy of Plaintiff's pleading of this claim in its Amended Complaint [Doc. #11] as it relates to Plaintiff's Motion for Preliminary Injunction [Doc. #13].

first-hand knowledge. (Mots. to Strike [Docs. #44, #65].) While Federal Rule of Civil Procedure 6(c)(2) does require any supporting affidavits to be served with a motion, the Court has discretion to consider affidavits that were not filed with the accompanying motions in preliminary injunction hearings. See 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2949, at 237 (2013) ("Rule 6(c)(2) requires any supporting affidavits to be served with the motion . . . . Although the timing requirements are applied flexibly in practice, the underlying principle of giving the party opposing the application notice and an adequate opportunity to respond is carefully honored by the courts."). The Court set the preliminary injunction hearing date shortly after issuing the TRO, and Plaintiff submitted its Reply [Doc. #57] and all of the affidavits at least two days before the hearing (and well in advance of the reply deadline), which allowed the Court and defense counsel at least some time to review all the arguments and evidence prior to the hearing. Therefore, the Court will exercise its discretion and consider all of Plaintiff's evidence, despite the untimely filings.

Furthermore, the Court has discretion to consider evidence that would otherwise be inadmissible at trial. See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Wright, Miller & Kane, supra, § 2949, at 239-40 ("[I]n practice[,] affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of Rule 56(c)(4), and[ ]hearsay evidence also may be considered."). The Court, therefore, in its discretion, will consider Plaintiff's evidentiary submissions at this stage without regard to whether they meet the strict evidentiary

7

requirements in place at either the summary judgment or trial stage. As such, the Court will deny Defendants' Motions to Strike [Docs. #44, #65].

## III.    ADEQUACY OF PLEADINGS

As previously discussed, Plaintiff's Motion for Preliminary Injunction [Doc. #13] relies solely on the breach of contract claim in the current operative Complaint (see Am. Compl. [Doc. #11], ¶¶ 22-28), and therefore, the Court is only considering the Motion for Preliminary Injunction as it relates to the Amended Complaint's sole breach of contract claim. However, the Court notes that the Amended Complaint does not actually assert any facts specific to the "otherwise establish a business relationship" language in the restrictive covenant, nor does the breach of contract cause of action assert that Defendants violated their contract by merely establishing a business relationship with Plaintiff's current agents. Rather, the Amended Complaint's breach of contract claim appears limited to the recruitment/solicitation portion of the restrictive covenant at issue in Plaintiff's Motion for Preliminary Injunction.[6]

Federal Rule of Civil Procedure 8(a) requires a "pleading that states a claim for relief" to include "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought, which may include relief in the alternative or different types of relief." The statement of the claim must give the defendant "fair notice" of the claim and the "grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct.

---

[6] The Court notes that Plaintiff's proposed Second Amended Complaint [Doc. #62-1] in its Motion to Amend the First Amended Complaint [Doc. #62] remedies this shortcoming. However, that Motion to Amend is not yet ripe for review.

1955, 167 L. Ed. 2d 929 (2007). However, Federal Rule of Civil Procedure 15(b)(2) allows for a party to try an issue not raised in the pleadings, as long as the parties expressly or impliedly consented to amending the pleadings in such a way. Fed. R. Civ. P. 15(b)(2). The plain language of Rule 15(b)(2) suggests that the non-pled issue must have gone to trial. Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." (emphasis added)); Feldman v. Pro Football, Inc., 419 F. App'x 381, 389 (4th Cir. 2011). However, the Fourth Circuit has affirmed a district court's grant of summary judgment on an issue raised for the first time in a party's motion for summary judgment, citing Rule 15(b)(2). People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 367-68 (4th Cir. 2001). Yet, at the preliminary injunction stage, courts are not making official findings of fact or adjudications on the merits, and therefore, courts are more likely looking to Rule 15(a)(2) in determining whether or not to allow a party to amend its pleading. Fed. R. Civ. P. 15(a)(2) ("In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.").

Plaintiff's allegations in both its Motion for TRO [Doc. #36] and its Motion for Preliminary Injunction [Doc. #13] provided notice to Defendants that it was seeking injunctive relief as to the "otherwise establishing a business relationship" language in the restrictive covenant. Furthermore, the "otherwise establish a business relationship" language of the covenant arose several times at the hearing and Defendants never objected on the basis that it was not alleged in the Amended Complaint. Finally, the Amended Complaint was specific

enough for Defendants to readily identify which restrictive covenant Plaintiff was seeking to enforce—a covenant which, upon reading, clearly encompasses the "otherwise establish a business relationship" language.  Therefore, the Court concludes that Defendants had sufficient notice of this factual basis for Plaintiff's request for preliminary injunction, as will be discussed later, even though this specific language of the restrictive covenant was not discussed in the operative Complaint.[7]

IV.    PRELIMINARY INJUNCTION

Injunctive relief is an extraordinary remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such relief.  Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948, at 129-30 (2d ed. 1995)).  In order to obtain a preliminary injunction, a movant must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365 (2008).  The Court will now consider each of these elements in turn.

A.    Likelihood of Success on the Merits

Parties seeking a preliminary injunction must demonstrate that they are likely to succeed on the merits.  Winter, 555 U.S. at 20, 129 S. Ct. at 374.  This inquiry requires that the movant

---

[7] The Court notes that this will likely be a moot point after the Court disposes of Defendants' Motion to Dismiss [Doc. #31] and Plaintiff's Motion to Amend [Doc. #62].

make a "clear showing" that he or she is likely to succeed at trial, though that does not require the movant to show a certainty of success. <u>Pashby v. Delia</u>, 709 F.3d 307, 321 (4th Cir. 2013). Plaintiff contends that it is likely to succeed on the merits of its breach of contract claim, because Defendants violated the restrictive covenant in their Agent Agreements and/or Management Agreements.[8]

The elements for a breach of contract claim under North Carolina law[9] are "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." <u>Samost v. Duke Univ.</u>, 742 S.E.2d 257, 260 (N.C. Ct. App. 2013) (quoting <u>Poor v. Hill</u>, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)). The North Carolina Supreme Court has stated that a restrictive covenant between an employer and an employee is only valid and enforceable under North Carolina law if it is: "(1) in writing; (2) reasonable as to terms, time, and territory (3) made part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." <u>Triangle Leasing Co., Inc. v. McMahon</u>, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990) (citing <u>Whittaker Gen. Med. Corp. v. Daniel</u>, 324 N.C. 523, 379 S.E.2d 824 (1989); <u>Kuykendall</u>, 322 N.C. at 649-50, 370 S.E.2d at 380; <u>Greene Co. v. Kelley</u>, 261 N.C. 166, 134 S.E.2d 166 (1964)). In order for a restrictive covenant to not be against public policy, it "must be no wider

---

[8] The restrictive covenant in each of these Agreements is virtually identical. Therefore, because all Defendants electronically signed the Agent Agreement, the Court will refer throughout this discussion to the restrictive covenant in the Agent Agreement as "the restrictive covenant" for convenience.

[9] The Agreements at issue each contain a choice-of-law clause providing that the contract is to be governed by North Carolina law. Neither party contends that any other jurisdiction's law should apply in interpreting the restrictive covenant at issue.

in scope than is necessary" to protect the legitimate business interests of the employer.  Med. Staffing Network, Inc. v. Ridgway, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009) (quoting Manpower v. Hedgecock, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979)); see Okuma Am. Corp. v. Bowers, 181 N.C. App. 85, 86, 638 S.E.2d 617, 618 (2007) ("When considering the enforceability of a covenant not to compete, a court examines the reasonableness of its time and geographic restrictions, balancing the substantial right of the employee to work with that of the employer to protect its legitimate business interests.").

The reasonableness of a restrictive covenant "is a matter of law for the court to decide." Hartman v. W.H. Odell and Assocs., Inc., 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994) (quoting Beasley v. Banks, 90 N.C. App. 458, 460, 368 S.E.2d 885, 886 (1988)).  In addition, the party seeking enforcement of the restrictive covenant has the burden of proving that the covenant is reasonable.  Id. (citations omitted).  Furthermore, restrictive covenants between employers and employees restrain trade and are scrutinized strictly.  Kennedy v. Kennedy, 160 N.C. App. 1, 9, 584 S.E.2d 328, 333 (2003) (citing United Labs. v. Kuykendall, 322 N.C. 643, 370 S.E.2d 375 (1988)); see Farr Assocs., Inc. v. Baskin, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000) ("Covenants not to compete between an employer and employee are 'not viewed favorably in modern law.'") (quoting Hartman, 117 N.C. App. at 311, 450 S.E.2d at 916).

Defendants do not dispute that the following two conditions for a valid restrictive covenant are satisfied: the covenant at issue is in writing and it is part of the employment contract.  However, Defendants contend that the remaining conditions for validity are not satisfied—namely, that the restrictive covenant is not based on valuable consideration, that the

restrictions are unreasonable, and that the restrictive covenant is against public policy. In addition, Defendants contend that even if Plaintiff can satisfy all five conditions, the restrictive covenant is nonetheless invalid for a variety of other reasons, including duress and fraudulent inducement. Finally, Defendants argue that even if the restrictive covenant is valid, Plaintiff has not submitted evidence that Defendants have violated or will violate the restrictive covenant. The Court will address each of these contentions in turn.

i.    Agreements Based on Valuable Consideration

Defendants first contend that Plaintiff cannot show that the agreements presented are based on valuable consideration. Defendants base this contention on the fact that the agreements presented as evidence by Plaintiff were "clicked through" or executed long after Defendants were hired or promoted,[10] and therefore, the Court should treat the agreements presented by Plaintiff as substitutions or novations, which require new or separate consideration. Plaintiff's counsel responded to this argument at the March 5, 2014 hearing by asserting that the Agent Agreements were executed by each of the Defendants when they began work as independent contractors for Plaintiff, and that the later "click throughs" do not qualify as superseding contracts or novations that would require additional consideration, because all

---

[10] Defendants acknowledge that this contention does not apply in the case of Defendant Meade, who allegedly signed a Management Agreement at a time that was near an increase in his commission level. However, Defendants contend that Defendant Meade earned that increase in commission level by reaching the then-required level of business, and that his signing of the Management Agreement was not connected to the increase in commission level. (Resp. to Pl.'s Mot. for Prelim. Inj. [Doc. #48], at 10.)

of the agreements are "exactly the same." (Mot. for Prelim. Inj. Hr'g Tr. [Doc. #76], at 58; see id. at 60 ("[T]o the extent there was more than one contract signed by the Defendants, all those contracts are identical.").) However, Plaintiff argues in the alternative that even if the clicked through Agreements each did constitute a novation to the original Agreement, separate consideration was present, because the Agreements provide access to the Lead Program. Plaintiff contends that access to the Lead Program is not required in order to maintain an agent relationship with Plaintiff, and therefore, Defendants' receipt of "access to and use of NAA products and services[ ]is significantly more than the mere continuation of the relationship." (Pl.'s Reply to Def.'s Resp. to Mot. for Prelim. Inj. [Doc. #57], at 4.)

Generally, when a restrictive covenant is entered into between an employer and an employee in connection with the initial hiring of the employee, "mutual promises of employer and employee furnish valuable considerations each to the other for the contract." Hejl v. Hood, Hargett & Assocs., Inc., 196 N.C. App. 299, 304, 674 S.E.2d 425, 428 (2009) (quoting Reynolds & Reynolds Co. v. Tart, 955 F. Supp. 547, 553 (W.D.N.C. 1997)) (internal quotation marks omitted). However, when the employment relationship is already established before the restrictive covenant is entered into, the covenant must be supported by new or separate consideration. Whittaker Gen. Med. Corp., 324 N.C. at 527, 379 S.E.2d at 827; Hejl, 196 N.C. App. at 304, 674 S.E.2d at 304 (citing Greene Co. v. Kelley, 261 N.C. 166, 168, 134 S.E.2d 166, 167 (1964)). Though Plaintiff has provided multiple contracts purportedly signed by Defendants, the Court does not have sufficient proof that Defendants signed the same contracts, containing an identical restrictive covenant, when they began their employment

relationship with Plaintiff.[11]    Therefore, the Court will assume that new or separate

consideration was required for even the earliest Agreements submitted by Plaintiff to the Court,

the authenticity of which Defendants do not dispute.

North Carolina courts have upheld the following benefits as new or separate

consideration sufficient to uphold a restrictive covenant entered into after a working

relationship already exists: "continued employment for a stipulated amount of time; a raise,

bonus, or other change in compensation; a promotion; additional training; uncertificated shares;

_____

[11] While Plaintiff has provided contracts that were signed by Defendants earlier than the most recent contracts (see Supp. Pettigrew Aff. [Doc. #60] and Exs. A-I [Docs. #60-1, #60-2, #60-3, #60-4, #60-5, #60-6, #60-7]), when compared with beginning dates of the agent relationship provided in Defendants' affidavits, it is unclear whether Plaintiff has provided the original contracts that Defendants signed when they began working for Plaintiff.  Furthermore, at least one of these earlier contracts submitted by Plaintiff is not identical to the most recently signed contracts submitted.  (Compare Ex. A – Supp. Pettigrew Aff., June 4, 2011 Eufemia Contract [Doc. #60-1], at 2-11, with Ex. A – Supp. Pettigrew Aff., July 10, 2012 Eufemia Contract [Doc. #60-1], at 12-25.)  Though this evidence is contrary to Plaintiff's counsel's contention at the preliminary injunction hearing that all contracts signed by Defendants are "exactly the same," the Court notes that the Second Pettigrew Affidavit indicates that there was a prior version of the Agent Agreement in effect for all agents who joined NAA before May 2011, which appears to match the different June 4, 2011 Eufemia contract. (See Supp. Pettigrew Aff. [Doc. #60], ¶ 6 at 2.)

Though the restrictive covenant at issue appears to be identical in all contracts submitted to the Court, the question of whether the later agreements constitute a novation requires an analysis comparing the earlier and later contracts in their entirety.  See Med. Staffing Network, Inc., 194 N.C. App. at 653, 670 S.E.2d at 326 ("If the parties do not say whether a new contract is being made, the courts will look to the words of the contracts, and the surrounding circumstances, if words do not make it clear, to determine whether the second contract supersedes the first.  If the second contract deals with the subject matter of the first so comprehensively as to be complete within itself or if the two contracts are so inconsistent that the two cannot stand together[,] a novation occurs." (quoting Whittaker Gen. Med. Corp., 324 N.C. at 526, 379 S.E.2d at 827)).

or some other increase in responsibility or number of hours worked." Hejl, 196 N.C. App. at 304, 674 S.E.2d at 428-29 (citing to various North Carolina cases in which each of these benefits were upheld as new or separate consideration for a restrictive covenant entered into after a working relationship began). Furthermore, courts do not evaluate the adequacy of the consideration—"[r]ather, the parties to a contract are the judges of the adequacy of the consideration." Id. at 305, 674 S.E.2d at 429. While illusory consideration is not sufficient to bind parties to a new agreement,[12] "[t]he slightest consideration is sufficient to support the most onerous obligation[;] the inadequacy . . . is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced." Id. (quoting Mach. Co. v. Ins. Co., 13 N.C. App. 85, 90-91, 185 S.E.2d 308, 311-12 (1971)) (internal quotation marks omitted).

Here, the most recent Agent Agreement signed by all Defendants states that "NAA . . . agrees to use commercially reasonable efforts to make available to Independent Contractor leads on a weekly basis so long as such leads are available and Independent Contractor is in compliance with the terms of this Agreement." (E.g., Ex. A - Pettigrew Aff. [Doc. #15-1], ¶ 2d at 4.) The Agreement also contains a consideration clause stating in part that "a renewal of [an agent's] access to NAA Products shall serve as independent consideration for any such reaffirmation, amendment or modification as shall be executed at the time of renewal." (Id. ¶ 17b at 11.) Furthermore, the Agreement states that an agent's "access to the NAA Products

_____

[12] Milner Airco, Inc. v. Morris, 111 N.C. App. 866, 870, 433 S.E.2d 811, 814 (1993).

is not permanent and is subject to termination by NAA even if this Agreement is not terminated." (Id.)  Plaintiff therefore contends that because an NAA agent is not guaranteed to be provided with leads, and does not have to be provided with leads in order to maintain agent status, then providing the agents with leads constitutes separate consideration for later clicked through employment agreements.

It is insufficient for an agreement to merely state that something is consideration if it does not actually bind the drafter to a promise.  See Milner Airco, Inc., 111 N.C. App. at 870, 433 S.E.2d at 814 (holding that consideration was at best illusory where the contract recited consideration but did not actually bind the employer to any promise, thereby rendering the contract unenforceable).  However, it appears here that Plaintiff promised to provide access to NAA products, including leads.  Furthermore, it appears that, hypothetically, an NAA agent could terminate his or her participation in the Lead Program, while maintaining an agent relationship with Plaintiff.  While discovery may ultimately demonstrate that this access to NAA products through the Lead Program does not operate in practice as new or separate consideration, the Court does yet not have any evidence to that effect.  Based on the evidence presented thus far, and the fact that the Court may not inquire as to the adequacy of consideration, it appears that access to the Lead Program is likely to qualify as separate consideration.  Therefore, Plaintiff has shown that it will likely succeed in demonstrating this condition of validity for the restrictive covenant at issue.

ii.    Reasonableness as to Terms, Time, and Territory

Next, Defendants contend that Plaintiff cannot demonstrate that the restrictive covenant is reasonable on its face.  Specifically, Defendants argue that the restriction period is excessive, asserting that it includes a "look-back" provision that increases the length of time to which Defendants are subjected to the restrictive covenant beyond two years.  In addition, Defendants contend that the terms "employee or independent contractor," "directly or indirectly," and "or its Affiliates" each render the restrictive covenant unreasonable by its terms and scope. Furthermore, Defendants argue that the covenant's deficiencies cannot be cured with the blue pencil doctrine,[13] and therefore, the entire restrictive covenant is invalid.

Plaintiff, however, contends that the restrictive covenant's restriction period of two years is reasonable, and specifically, that it does not include a look-back provision, as Defendants suggest.  Plaintiff further argues that none of the terms that Defendants have identified render the restrictive covenant unreasonable, but even if the Court found that any of the terms are unreasonable, they are separable, and therefore such a deficiency could be cured by applying the blue pencil doctrine.

When considering the geographic limits outlined in a restrictive covenant,[14] North

---

[13] If part of a restrictive covenant under North Carolina law is unenforceable, the blue pencil doctrine limits the ability of courts to alter and enforce the rest of the covenant. Hartman, 117 N.C. App. at 317, 450 S.E.2d at 920.

[14] Although Plaintiff suggests that, unlike non-compete covenants, non-solicitation covenants should not be subject to geographical and/or temporal restrictions, North Carolina courts (unlike some other jurisdictions) apply the same reasonability analysis to both types of restrictive covenants.  Therefore, this Court will apply the analysis utilized by North Carolina

Carolina courts look to six overlapping factors: "(1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation." Okuma Am. Corp., 181 N.C. App. at 89, 638 S.E.2d at 620 (quoting Hartman, 117 N.C. App. at 312, 450 S.E.2d at 917). Furthermore, "the time and geographic limitations of a covenant not to compete must be considered in tandem, such that '[a] longer period of time is acceptable where the geographic restriction is relatively small, and vice versa.'" Id. at 89, 638 S.E.2d at 620 (quoting Farr Assocs., Inc., 138 N.C. App. at 280, 530 S.E.2d at 881). Therefore, while either restriction may be reasonable standing alone, "the combined effect of the two may be unreasonable." Id. (quoting Farr Assocs., Inc., 138 N.C. App. at 280, 530 S.E.2d at 881).

As a general proposition, a restriction period of two years is well within the range that the North Carolina courts have deemed reasonable. See, e.g., Triangle Leasing Co., Inc., 327 N.C. 224 at 229, 393 S.E.2d at 857-58 (finding that a two-year restriction period was not unreasonable "where the activity prohibited is as narrowly confined as in the case before us"—that is, solicitation of the plaintiff's clients anywhere within North Carolina, despite the fact that the employee's contacts were limited to clients in Wilmington); Kennedy, 160 N.C. App. at 9-10, 584 S.E.2d at 333-34 (upholding as reasonable a three-year restriction period as to the non-compete covenant). Furthermore, Defendants' argument that a look-back period

courts to this restrictive covenant, even though it is a non-solicitation covenant.

extends this restriction period beyond two years is without merit. "[W]hen a [restrictive covenant] reaches back to include clients of the employer during some period in the past, that look-back period must be added to the restrictive period to determine the real scope of the time limitation." Farr Assocs., Inc., 138 N.C. App. at 280, 530 S.E.2d at 881 (citing Prof. Liab. Consultants, Inc. v. Todd, 345 N.C. 176, 478 S.E.2d 201 (1996) (per curiam), adopting 122 N.C. App. 212, 468 S.E.2d 578 (1996) (Smith, J. dissenting)). By contrast, the restrictive covenant in this case does not limit Defendants' freedom to solicit or establish a business relationship with *any* former employee of Plaintiff's, including ones who may have been NAA employees or independent contractors before or after Defendants' business relationships with Plaintiff were terminated. Thus, there is no look-back period, and the post-termination time restriction is therefore limited to two years.

With regard to a geographic restriction, North Carolina courts have recognized the validity of geographic restrictions that are client-based, rather than limited by area, as long as those client-based limitations are not unduly vague. E.g., Kuykendall, 322 N.C. at 660, 370 S.E.2d at 386; Wade S. Dunbar Ins. Agency, Inc. v. Barber, 147 N.C. App. 463, 469, 556 S.E.2d 331, 335-36 (2001). The covenant in this case utilizes an employee-based restriction, rather than a geographic restriction, which North Carolina courts have also upheld when the overall effect is reasonable. See Kennedy, 160 N.C. App. at 9-12, 584 S.E.2d at 333-35 (reversing the trial court's denial of a preliminary injunction because plaintiff showed a likelihood of success on the merits as to enforcement of a restrictive covenant prohibiting solicitation or employment of plaintiff's employees). In light of this restrictive covenant's employee-based restriction

application only to current NAA employees or independent contractors, and the time restriction being no more than two years, the time and geographic restrictions in this covenant, considered in tandem, are not unreasonable.

As to the reasonableness of the terms of the agreement, Defendants argue that the terms "employee or independent contractor," "directly or indirectly," and "affiliates" each render the restrictive covenant unreasonable. First, with regard to independent contractors, Defendants argue that Plaintiff received certain benefits by classifying Defendants as independent contractors, and Plaintiff should not now be able to hold them to the same restrictions as an employee. In essence, Defendants make a policy argument as to why Plaintiff should not be able to "have its cake and eat it too." However, North Carolina courts have upheld the application of restrictive covenants to independent contractors. See, e.g., Mkt. Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 154, 520 S.E.2d 570, 578 (1999) (dismissing the plaintiff's argument that the covenant cannot be enforced against her due to her status as an independent distributor, because "this Court has held that non-competition clauses are applicable to independent contractor relationships" (citations omitted)). This Court is applying North Carolina law as North Carolina courts have interpreted it, and thus, this Court may not adopt a policy argument that North Carolina courts have rejected. Therefore, the enforcement of a restrictive covenant against independent contractors is not *per se* unreasonable, and does not render this restrictive covenant unenforceable against Defendants.

Next, Defendants contend that the use of the term "directly or indirectly" renders the covenant unenforceable. Whether restrictive covenants that utilize "directly or indirectly"

language are reasonable depends on the larger context of the agreement. Compare VisionAIR, Inc. v. James, 167 N.C. App. 504, 506, 508-09, 606 S.E.2d 359, 361, 362-63 (2004) (holding that a non-compete covenant with "directly or indirectly" language is overbroad and therefore unenforceable) with Triangle Leasing Co., Inc., 327 N.C. at 228-29, 393 S.E.2d at 857-58 (holding that a restrictive covenant with "directly or indirectly" language is reasonable in light of the limited activity constrained). Therefore, the Court must look at the entirety of the restrictive covenant to determine whether the terms are unreasonable, rather than the mere presence of "directly or indirectly" language. For example, the covenant deemed unreasonable in VisionAIR prevented the defendant from owning, managing, being employed by, or otherwise participating in, directly or indirectly, any business similar to the plaintiff's, within the Southeast for two years. VisionAIR, Inc., 167 N.C. App. at 508, 606 S.E.2d at 362. Such a broad range of constrained activity could have prevented the VisionAIR defendant from doing wholly unrelated work at any firm similar to VisionAIR, or from even indirectly owning a share in any similar firm (thereby prohibiting him from, for example, holding interest in a mutual fund invested in part in a firm engaged in business similar to VisionAIR's). Id. at 508-09, 606 S.E.2d at 362-63. However, the restrictive covenant before the Court in this case is much more limited—it merely restricts Defendants from soliciting or hiring a finite group of individuals (Plaintiff's current employees or independent contractors). Therefore, the "directly or indirectly" language does not render this restrictive covenant unreasonable.

Finally, although Plaintiff is not attempting to enforce the "or its Affiliates" part of the restrictive covenant, Defendants contend that this portion of the restrictive covenant

nevertheless renders the entire restrictive covenant unenforceable, in light of North Carolina's strict blue pencil doctrine. The Agent Agreement defines "Affiliates" as "the affiliates of NAA, including without limitation, Pro Data Research, LLC and K.I.T. Marketing, LLC, each of whom are deemed to be third-party beneficiaries to the terms of this Agreement." (E.g., Ex. A - Pettigrew Aff. [Doc. #15-2], ¶ 10a at 9 (emphasis added).) The restrictive covenant purports to apply three of the four restrictions that apply to Plaintiff's current employees or independent contractors to those current employees or independent contractors of Plaintiff's Affiliates as well. Therefore, if enforced, the "or its Affiliates" part of the restrictive covenant would mean that, in addition to limiting Defendants' interactions with current NAA employees or independent contractors, the covenant would also operate to limit Defendants' interactions with current employees or independent contractors of an unlimited and ambiguously defined set of Plaintiff's affiliates. See Med. Staffing Network, Inc., 194 N.C. App. at 657, 670 S.E.2d at 328 ("[Plaintiff] presented no evidence, and the trial court made no findings that [Plaintiff] had any legitimate business interest in preventing competition with, foreclosing the solicitation of clients and employees of, and protecting the confidential information of an unrestricted and undefined set of [Plaintiff's] affiliated companies that engage in business distinct from the medical staffing business in which [Defendant] had been employed. We conclude that on its face, this bar extends beyond any legitimate interest [Plaintiff] might have in this case." (emphasis added)). Such a broad restriction is likely unreasonable, and therefore, unenforceable.

Therefore, the Court must determine whether Plaintiff's non-enforcement of this

language saves the rest of the restrictive covenant, and if not, whether North Carolina's blue pencil doctrine can be applied to save the rest of the restrictive covenant. Plaintiff dismisses Defendants' position that the "or its Affiliates" language renders the entire restrictive covenant unenforceable as "an exercise in chasing the hypothetical," since Plaintiff is not trying to enforce that language. (Pl.'s Reply to Def.'s Resp. to Mot. for Prelim. Inj. [Doc. #57], at 5.) However, North Carolina courts do not simply ignore an unreasonable part of a restrictive covenant that the plaintiff is not trying to enforce—rather, they still apply the blue pencil approach in those cases. See Whittaker Gen. Med. Corp., 324 N.C. at 528, 379 S.E.2d at 828 ("In this case the plaintiff has not attempted to enforce the provision of the contract which forbids [the defendant] from engaging in manufacturing. That provision is not before us. We hold that the part which is before us is separable and may be enforced by the award of damages." (emphasis added)).

Therefore, the Court must consider whether the strict blue pencil approach saves the remaining portions of the restrictive covenant from its unreasonable "or its Affiliates" language. "When the language of a covenant not to compete is overly broad, North Carolina's 'blue pencil' rule severely limits what the court may do to alter the covenant." Hartman, 117 N.C. App. at 317, 450 S.E.2d at 920. Specifically, the Court "at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable[—i]t may not otherwise revise or rewrite the covenant." Id. Thus, although Plaintiff has indicated that it is not intending to enforce the "or its Affiliates" language, it would still have the effect of rendering the entire covenant unenforceable unless it is separable.

However, the "or its Affiliates" language in this restrictive covenant is separable. Although it is not separated off by number or in a different clause, the language can readily be struck through and the rest of the restrictive covenant still makes sense and stands on its own. Therefore, to the extent that the "or its Affiliates" language renders the restrictive covenant unreasonable, it is likely separable from the remainder of the covenant, which is reasonable.

Finally, Defendants also contend that the Court may not employ the blue pencil to a covenant at the preliminary injunction stage. See Tech. Partners, Inc. v. Hart, 298 F. App'x 238, 244 n.4 (4th Cir. 2008) ("[Plaintiff's] argument about blue penciling also seems to neglect the context of the district court's ruling, i.e., a determination of [Plaintiff's] likelihood of succeeding on the merits. Since the court was not actually determining the validity of the covenants on the merits, the employment of blue penciling by the district court to try to ensure their validity would not have been appropriate."). However, this Court and North Carolina courts do consider the blue pencil analysis at the preliminary injunction stage, as it is part of the required analysis in determining whether a Plaintiff is likely to succeed in enforcing a restrictive covenant which is otherwise reasonable. See Asheboro Paper and Packaging, Inc. v. Dickinson, 599 F. Supp. 2d 664, 676 (M.D.N.C. 2009) (determining first whether the overbroad terms are separable before denying the plaintiff's preliminary injunction); Prof. Liab. Consultants, Inc. v. Todd, 122 N.C. App. 212, 468 S.E.2d 578 (1996) (Smith, J. dissenting), adopted by 345 N.C. 176, 478 S.E.2d 201 (1996) (per curiam) (reversing the trial court's granting of preliminary injunction where the blue pencil doctrine does not save the remainder of the restrictive covenant). Therefore, the Court finds that the problematic part of the restrictive

covenant—that is, the "or its Affiliates" language—is likely separable. Thus, the Court concludes that Plaintiff is likely to succeed in enforcing the remaining portion of the restrictive covenant.

### iii. Public Policy

Finally, Defendants contend that this restrictive covenant violates public policy, because it is broader in scope than that which is necessary to protect Plaintiff's legitimate business interests. Plaintiff responds that its agents are not just a legitimate business interest—indeed, they *are* Plaintiff's business, which the restrictive covenant is designed to protect. (Mot. for Prelim. Inj. [Doc. #14], at 7.)

A restrictive covenant that is broader than that which is reasonably necessary to protect an employer's legitimate business interests will not be enforced under North Carolina law. Whittaker Gen. Med. Corp., 324 N.C. at 528, 379 S.E.2d at 828; Med. Staffing Network, Inc., 194 N.C. App. at 656, 670 S.E.2d at 327 (quoting Manpower, 42 N.C. App. at 521, 257 S.E.2d at 114). North Carolina courts have held that "protection of customer relationships and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." Kennedy, 160 N.C. App. at 11-12, 584 S.E.2d at 335 (quoting Kuykendall, 322 N.C. at 651, 370 S.E.2d at 381).

As previously discussed, this restrictive covenant does not forbid Defendants from soliciting or hiring Plaintiff's *former* employees or independent contractors. Rather, the restrictive covenant merely limits how Defendants may interact with Plaintiff's *current* employees or independent contractors. This kind of "anti-poaching" restriction has been upheld under

26

North Carolina law as no broader in scope than required to reasonably protect an employer's legitimate business interest.  See Kennedy, 160 N.C. App. at 9-12,  584 S.E.2d at 333-35 (reversing the trial court's denial of a preliminary injunction because plaintiff showed a likelihood of success on the merits that its restrictive covenant prohibiting solicitation or employment of the plaintiff's employees was enforceable); cf. Inland Am. Winston Hotels, Inc. v. Crockett, 212 N.C. App. 349, 356, 712 S.E.2d 366, 371 (2011) (implying that a restriction against hiring certain former employees of the plaintiff's could be upheld as reasonable if it were included in the restrictive covenant).  Furthermore, as previously discussed, the Court will not enforce the separable "or its Affiliates" part of the restrictive covenant.  Therefore, the Court concludes that the remaining restrictive covenant is likely no broader than is reasonably necessary to protect Plaintiff's legitimate business interests.

        iv.     Duress and Fraudulent Inducement

Defendants also contend that, even if the restrictive covenant is valid on its face, the Court should not enforce the restrictive covenant, because the Agreements were procured by duress and fraudulent inducement.  Plaintiff responds that neither duress nor fraudulent inducement is applicable in this case.

Beginning with duress, Defendants argue that they were "coerced under duress" into electronically executing the agreements after Plaintiff "locked them out" of the website where they accessed leads, which "threatened Defendants' ability to conduct business and earn a living." (Resp. to Pl.'s Mot. for Prelim. Inj. [Doc. #14], at 19.)  However, "[d]uress exists where one, by the *unlawful* act of another, is induced to make a contract or perform or forego some act

under circumstances *which deprive him of the exercise of free will.*"  Radford v. Keith, 160 N.C. App. 41, 43-44, 584 S.E.2d 815, 817 (2003) (emphasis added) (quoting Smithwick v. Whitley, 152 N.C. 369, 371, 67 S.E. 913, 914 (1910)) (internal quotation marks omitted), aff'd per curiam, 358 N.C. 136, 591 S.E.2d 519 (2004).  "By duress, in its more extended sense, is meant that degree of severity, either threatened and impending, or actually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness."  Id. at 45, 584 S.E.2d at 818 (quoting Edwards v. Bowden, 107 N.C. 58, 60, 12 S.E. 58, 58 (1890)) (internal quotation marks omitted).

An unlawful or wrongful act is a necessary element of duress.  Id. at 43-44, 584 S.E.2d at 817.  Defendants do not allege that Plaintiff acted unlawfully or wrongfully by locking them out of the website where leads are accessed.  Furthermore, though Plaintiff's conduct of cutting off Defendants' access to leads may have "threatened Defendants' ability to conduct business and earn a living," that alone falls short of depriving Defendants of the exercise of free will, as is required for duress.  Therefore, Defendants' duress argument will likely be unsuccessful.

Next, Defendants contend they were fraudulently induced into signing the agreements containing the restrictive covenant.  "The essential elements of fraud [in the inducement] are: (1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party."  TradeWinds Airlines, Inc. v. C-S Aviation Servs., 733 S.E.2d 162, 168 (N.C. Ct. App. 2012) (first alteration in original) (quoting Media Network, Inc. v. Long Haymes Carr, Inc., 197 N.C. App. 433, 453, 678 S.E.2d 671, 684 (2009)).  While Defendants have identified various

allegedly false or misleading representations made by Plaintiff's officers, Defendants do not make any attempt to apply the fraud analysis to the facts of this case. Indeed, they do not even state the elements of fraudulent inducement in their Response Brief. Therefore, at this juncture, it does not appear likely that Defendants can demonstrate that the Agreements containing the restrictive covenant were induced by fraud.

In sum, the Court concludes at this stage that it is unlikely that the restrictive covenants are unenforceable because they were entered into under duress or fraudulent inducement.[15]

### v. Evidence of Breach by Defendants

Defendants also argue that, even if the Agreements are valid and enforceable, Plaintiff has not offered any admissible evidence that Defendants have already violated or will violate the restrictive covenant. The basis of this argument relies on arguments put forth in Defendants' two Motions to Strike [Docs. #44, #65] that Plaintiff's evidence is inadmissible.

As the Court previously discussed, it has, in its discretion, considered the evidence Plaintiff submitted at this preliminary stage. To that end, Plaintiff has submitted adequate proof to show that Defendants have likely violated the terms of the restrictive covenant. Specifically, Plaintiff has provided evidence tending to show that Defendants have established a business relationship with approximately 121 current NAA employees or independent contractors (See, e.g., Sheckells Supp. Aff. and Exs. [Doc. #59].) Furthermore, Plaintiff presented evidence that

---

[15] The Court further notes that Defendants have not alleged any counter-claims against Plaintiff, including any counter-claims that Plaintiff materially breached any of the terms of the agreements at issue.

at least some Defendants were making preparations to leave Plaintiff's employ, and take other NAA agents with them, prior to the termination of their business relationship with Plaintiff. (See Palvia Second Aff. and Exs. [Doc. #58].) Therefore, the Court has determined that Plaintiff has submitted sufficient proof to show that Defendants have likely breached the restrictive covenant. Because the Court has also determined that the restrictive covenant at issue is likely valid and enforceable, the Court concludes that Plaintiff has demonstrated a likelihood of success on the merits.

B.      Likelihood of Irreparable Harm

Plaintiff contends that it is likely to suffer irreparable harm in the absence of injunctive relief because the poaching of Plaintiff's agents has damaged, and will continue to damage, Plaintiff's goodwill in the insurance industry, and such damage cannot be adequately fixed or measured with monetary damages. However, Defendants contend that Plaintiff's allegations are insufficient, as they are speculative and as Plaintiff waited two to three months to file its Complaint and Motion for Preliminary Injunction, which severely undercuts the necessity of injunctive relief. Defendants also contend that any harm to Plaintiff can be adequately compensated by the liquidated damages provision in the Agreements.

"[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) (quoting Danielson v. Local 275, 479 F.2d 1033, 1037 (2d Cir. 1973)). Furthermore, the Fourth Circuit has held that "the threat of . . . the potential loss of goodwill [ ] support[s] a finding of irreparable harm" in the preliminary injunction analysis. Id.

at 552.

Plaintiff has presented evidence that approximately 121 current NAA agents are now working for Defendant Meaike's company, FFL. Plaintiff contends that "[t]he immediate economic harm [caused by approximately 121 current NAA agents now working for FFL] is obvious." (Pl.'s Reply to Def.'s Resp. to Mot. for Prelim. Inj. [Doc. #57], at 8.) While Plaintiff does not offer an estimated percentage of its total agents that this 121 agents represents, Plaintiff's counsel contended at the preliminary injunction hearing that such a strictly quantitative evaluation would not accurately reflect the qualitative talent lost at the expense of Defendants' actions. Plaintiff also points to the value of the relationships built over time and the impact that a "mass exodus" of Plaintiff's agents could have on Plaintiff's relationships with its represented insurance carriers. (Pl.'s Reply to Def.'s Resp. to Mot. for Prelim. Inj. [Doc. #57], at 8.) Therefore, the Court finds that Plaintiff's potential loss of goodwill within the insurance industry supports a finding that Plaintiff is likely to suffer irreparable harm without injunctive relief.

As for Defendants' contention that Plaintiff's delay in filing its Complaint and Motion for Preliminary Injunction severely undercuts the necessity of injunctive relief, Defendant relies on Southtech Orthopedics, Inc. v. Dingus, 428 F. Supp. 2d 410 (E.D.N.C. 2010). However, Southtech Orthopedics is distinguishable from this case. In Southtech Orthopedics, the agreement at issue included a provision stating that it was "understood that *it takes only a few days* to destroy the goodwill and patronage of the Employer by hostile activities of the Employee." 428 F. Supp. 2d at 420 (emphasis added). Defendants here have not pointed to a comparable

statement in any of the Agreements. Furthermore, the six-week delay in <u>Southtech Orthopedics</u> was due to the plaintiff's attempts to negotiate with the defendant concerning the payment of money to release the defendant from the covenant. <u>Id.</u> at 420. In this case, Plaintiff filed its original Complaint on December 27, 2013, approximately two weeks after the first Defendants terminated their business relationships with Plaintiff. Plaintiff then filed its Amended Complaint to include all six Defendants on January 29, 2014, and its Motion for Preliminary Injunction two days later. Under the circumstances, any delay by Plaintiff in filing its Complaint or Motion for Preliminary Injunction is not significant enough to undercut the necessity for injunctive relief.

Finally, as to Defendants' argument that the liquidated damages provision provides an adequate remedy, the Court notes that the liquidated damages provision in the Agent Agreement states that "[n]othing in this Agreement shall prevent or prohibit [Plaintiff] from seeking injunctive relief . . . ." (Ex. 1, Pl.'s Mot. for Prelim. Inj. [Doc. #15-1], ¶ 25c at 14.) In light of the very language of the liquidated damages provision, the liquidated damages provision does not help Defendants show that Plaintiff has failed to show a likelihood of irreparable harm. Therefore, the Court finds that Plaintiff has demonstrated a likelihood of irreparable harm without injunctive relief.

C.      Balance of Equities

Plaintiff contends that the balance of equities weighs in its favor, because although Plaintiff is suffering ongoing irreparable harm, "Defendants will suffer no harm if this Court enjoins them from doing what they agreed not to do." (Pl.'s Mem. in Support of Mot. for

Prelim. Inj. [Doc. #14], at 12 (emphasis removed).) However, Defendants respond that Plaintiff comes to the Court with unclean hands, insofar as its "conduct has been substantially similar to the conduct it seeks to enjoin[, as m]any of Plaintiff's agents were recruited away from other insurance sales organizations." (Resp. to Pl.'s Mot. for Prelim. Inj. [Doc. #48], at 31.) Plaintiff contends that Defendants' unclean hands argument rests on allegations about Plaintiff's conduct in the operation of its business, rather than on the equities at stake in enforcing the restrictive covenant. Plaintiff further contends that Defendants' equities arguments are belied by FFL's usage of a comparable restrictive covenant in its agent agreements.

In order to obtain a preliminary injunction, Plaintiff is required to demonstrate that the balance of equities tips in its favor. Winter, 555 U.S. at 20, 129 S. Ct. at 374. While unclean hands can be a defense to injunctive relief (see Kennedy, 160 N.C. App. at 15, 584 S.E.2d at 337), Defendants do not apply any case law on the doctrine of unclean hands beyond cursorily stating that "Plaintiff's conduct constitutes unclean hands" and that "[e]xamples of Plaintiff's unclean hands are noted throughout." (Resp. to Pl.'s Mot. for Prelim. Inj. [Doc. #48], at 31.) Without more, the Court cannot conclude that Plaintiff acted with unclean hands in such a way as to tip the balance of equities in Defendants' favor.

Furthermore, Plaintiff has presented evidence, which Defendants do not dispute, of a contract that FFL uses within its own company, containing a restrictive covenant that is very similar in effect (though not exactly verbatim in language) to that which Plaintiff seeks to enforce. In addition, Plaintiff also presented evidence, which Defendants have not disputed, that at least some Defendants were planning ahead and working diligently on creating a

competing business with other then-NAA agents while they were all still working for Plaintiff. After considering the arguments made by all parties, the Court concludes that Plaintiff has demonstrated that the balance of equities tips in its favor.

D.    Public Interest

Finally, Plaintiff must demonstrate that an injunction is in the public interest. Plaintiff contends that the public interest is served by enforcing this restrictive covenant, because enforcement of valid private contracts entered into knowingly and voluntarily is in the public interest. Defendants do not dispute this contention, and indeed, do not present any argument as to this element.

Here, there are competing public interests. On one hand, the public interest is served by ensuring that valid contracts are enforced. Asheboro Paper and Packaging, Inc., 599 F. Supp. 2d at 678 (citing UBS PaineWebber, Inc. v. Aiken, 197 F. Supp. 2d. 436, 448 (W.D.N.C. 2002)). However, restrictive covenants in the employment context restrain employees' freedom to pursue employment with whomever they choose, and therefore, are disfavored by North Carolina courts. See VisionAIR, Inc., 167 N.C. App. at 508, 606 S.E.2d at 362 (quoting Farr Assocs., Inc., 138 N.C. App. at 279, 530 S.E.2d at 881). The Court concludes that in this case, the interest in enforcing valid contracts outweighs the interest in Defendants' freedom to pursue employment in a manner that contravenes the restrictive covenant. Therefore, Plaintiff has demonstrated that injunctive relief is in the public interest, and indeed, that Plaintiff is entitled to a preliminary injunction.

IV.    ADDITIONAL MATTERS

A.    New Relief Requested by Plaintiff

At the March 5, 2014 hearing, Plaintiff's counsel for the first time requested that the Court impose an additional remedy different from that which was ordered in the TRO—namely, an order requiring Defendants to sever business relationships with those individuals who were NAA agents when they entered into an agent relationship with Defendants. (Mot. for Prelim. Inj. Hr'g Tr. [Doc. #76], at 36.) Plaintiff contends that those individuals are the approximately 121 agents highlighted in green in Exhibit A of the Sheckells Supplemental Affidavit [Doc. #59-1].

While the Court finds it appropriate to issue an injunction ordering that Defendants abide by the restrictive covenant until a final decision on the merits is reached, this additional remedy requested by Plaintiff goes a step further by requesting that the Court essentially order FFL (not a party to this case) to fire 121 individuals. The Court will not order such drastic relief without an adjudication on the merits, and certainly not prior to discovery. While Defendants have not disputed that those 121 individuals began working for FFL without terminating their employment relationship with Plaintiff, Defendants did not have adequate time to prepare a response to the drastic remedy that Plaintiff requested for the first time at the hearing. Therefore, the Court denies Plaintiff's request to extend its preliminary injunctive relief to an order requiring Defendants to sever their existing business relationships with these 121 agents.

B.    Application of this Order to Other Parties

At the preliminary injunction hearing and afterward in a Supplemental Brief and Motion to Compel Letters Related to the TRO or the March 5, 2014 hearing [Doc. #68], Defendants raised concerns regarding correspondence from Plaintiff to third parties regarding the effect of the Court's Order on those third parties. The Court asked Plaintiff's counsel what the contents of the correspondence were at the hearing. (Mot. for Prelim. Inj. Hr'g Tr. [Doc. #76], at 62.) While Plaintiff's counsel did not have a copy of the correspondence then, Plaintiff later provided copies to the Court in its Response to Defendants' Supplemental Brief and Motion to Compel [Doc. #70]. Because Plaintiff provided an example of each version of correspondence that Defendants sought in their Motion to Compel (correspondence related to issuance of the TRO [Doc. #70-1] and correspondence related to the preliminary injunction hearing [Docs. #70-2, #70-3]), Defendants' Motion to Compel is now moot.[16]

In light of the questions raised regarding this correspondence, the Court will clarify the application of this Order as to third parties. Federal Rule of Civil Procedure 65(d)(2) states that an injunction is binding not only on named parties, but also on any "other persons who are in active concert or participation" with the named parties or their officers, agents, servants, employees, or attorneys, as long as those non-parties acting in active concert or participation

---

[16] To the extent that Defendants request in their Reply that the Court order Plaintiff to produce all letters to non-parties referencing the TRO, the Court denies this request at this time. However, if discovery reveals that Plaintiff issued communications that are materially different from those it submitted to the Court on this matter, Defendants may file an appropriate motion at that time.

receive actual notice of the injunction. Fed. R. Civ. P. 65(d)(2). "As the Supreme Court has explained, the purpose of this rule is to prevent defendants from 'nullify[ing] a decree by carrying out prohibited acts through aiders and abettors.'" <u>K.C. ex rel. Africa H. v. Shipman</u>, 716 F.3d 107, 115 (4th Cir. 2013) (quoting <u>Regal Knitwear Co. v. NLRB</u>, 324 U.S. 9, 14, 65 S. Ct. 478, 89 L. Ed. 661 (1945)).

Plaintiff's correspondence to third-party insurance carriers states, "it is [Plaintiff's] understanding that you are in a business relationship with, and are therefore in active concert or participation with, the Defendants and their corporation, Family First Life Insurance." (Ex. 1 - Resp. to Supp. Br. [Doc. #70-1], at 3.) While that may have been Plaintiff's understanding or interpretation of the Court's TRO, the Court finds that this interpretation goes too far, and therefore, the Court will take the opportunity to clarify the matter at this juncture. The Court finds that "active concert or participation" necessarily connotes a greater level of engagement than that of a third-party company simply maintaining a business relationship with FFL, a non-party to this lawsuit. If Plaintiff's interpretation were correct, the Court could theoretically hold *any* company with which FFL has established a business relationship in contempt for retaining a business relationship with FFL—not just third-party insurance carriers, but also, for example, a company that provides utilities to FFL, as Defendants contend. (Reply to Resp. to Supp. Br. [Doc. #75], at 4.) Such an interpretation goes too far.

Therefore, the Court clarifies that it does not consider a third party which has merely established a business relationship with FFL to be "in active concert or participation" with Defendants, such that the third party would be in violation of this preliminary injunction.

Rather, this Court considers "active concert or participation" under this Order to require some active assistance to or participation with Defendants in soliciting, advising, or recommending a current NAA employee or independent contractor to work with any of the Defendants, or some active assistance to or participation with Defendants in encouraging or advising a current NAA employee or independent contractor to sever, discontinue, or not renew the relationship with Plaintiff.

### C.    Bond Requirement

Rule 65(c) provides: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Fourth Circuit has described this bond requirement as "mandatory and unambiguous." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999) (citing Dist. 17, UMWA v. A & M Trucking, Inc., 991 F.2d 108, 110 (4th Cir. 1993)).

In issuing the TRO in this case, the Court found that a bond of $100,000.00 was appropriate and adequate to protect Defendants, should it later be found that Defendants were wrongly enjoined or restrained. The Court finds that the $100,000.00 bond is still appropriate security. Therefore, Plaintiff's bond requirement of $100,000.00 remains in effect.

## V.    CONCLUSION

For the reasons discussed above, IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction [Doc. #13] is GRANTED IN PART, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. Specifically, IT IS ORDERED that Defendants are

immediately restrained and enjoined from the following:

1. soliciting any current NAA employee or independent contractor for the provision of services or employment;

2. advising or recommending to any other person that he or she employ or solicit for provision of services any current NAA employee or independent contractor;

3. encouraging or advising any current NAA employees or independent contractors to sever, discontinue, or not renew any agreement with or relationship to Plaintiff; or

4. otherwise establishing, or seeking to establish, any business relationship with any current NAA employee or independent contractor relating to the sale of life insurance products.

IT IS FURTHER ORDERED that Plaintiff's request that the Court order Defendants to sever ties with individuals who Plaintiff has identified as its current employees or independent contractors is DENIED without prejudice to Plaintiff renewing its request upon adjudication of the claims on the merits.

IT IS ALSO ORDERED that third parties which have merely established a business relationship with FFL are not "in active concert or participation" with Defendants, such that those third parties are in violation of this preliminary injunction. Rather, "active concert or participation" under this Order requires some active assistance to or participation with Defendants in soliciting, advising, or recommending a current NAA employee or independent contractor to work with any of the Defendants, or some active assistance to or participation with Defendants in encouraging or advising a current NAA employee or independent contractor to sever, discontinue, or not renew the relationship with Plaintiff.

In addition, IT IS ORDERED that, pursuant to Rule 65(c) of the Federal Rules of Civil

Procedure, Plaintiff's bond requirement of $100,000.00 remains in effect. The Court finds that such a bond is appropriate and adequate to protect Defendants, should it later be found that Defendants were wrongly enjoined or restrained.

Finally, IT IS ORDERED that Defendants' Motions to Strike [Docs. #44, #65] are DENIED and that Defendants' Motion to Compel [Doc. #68] is DENIED AS MOOT.

This the 11th day of April, 2014.

United States District Judge